**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEF RICHARD MADAR**, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | 2:07cv1254 |
| | ) | Electronic Filing |
| **UNITED STATES CITIZENSHIP AND** | ) | |
| **IMMIGRATION SERVICES**, | ) | |
| | ) | |
| Respondent. | ) | |

## OPINION

Pending before this court is Josef Richard Madar's ("petitioner Madar" or "petitioner") habeas corpus petition pursuant to 28 U.S.C. § 2241. The petition presents a claim for recognition of United States citizenship following a remand by the United States Court of Appeals for the Third Circuit. The parties have submitted a joint stipulation of undisputed facts, a joint stipulation of undisputed law and briefs setting forth their respective positions on the petition.[1] The parties agree that the record has been fully developed and the matter is ripe for disposition. For the reasons set forth below, the petition will be denied.

Petitioner entered the United States through New York City on April 29, 1991, pursuant to a B-2 "visitor for pleasure" visa and thereafter made his way to the Pittsburgh metropolitan area. He failed to depart when that visa expired and was placed into removal proceedings. Since that time he has sought to adjust his status and obtain United States citizenship through a variety of avenues. Those efforts have been unsuccessful. In this proceeding petitioner Madar seeks a declaration that he obtained United States citizenship through his father.

Petitioner's father, Josef Madar, Sr. ("petitioner's father" or "Madar Sr."), was a United States citizen at birth who was born in Czechoslovakia and lived there his entire life. The issue

---

[1] The government has submitted administrative records and evidentiary exhibits in its response to petitioner's amended petition. See Doc. No. 83-1, 83-2 and 83-3. Petitioner has set forth evidentiary exhibits in support of his reply brief. See Doc. No. 100-1, 100-2 and 100-3.

presented is whether petitioner's father should be deemed to have transmitted citizenship to petitioner. Petitioner maintains that through the defenses of unawareness and/or impossibility of performance and the doctrine of constructive physical presence, Madar Sr. retained his United States citizenship while he lived behind the Iron Curtain in Czechoslovakia. And by extension and through the principles of equity recognized in Matter of Navarrete, 12 I. & N. Dec. (1967), Madar Sr. was able to and did transmit citizenship to petitioner Madar when he was born. Thus, petitioner requests a declaration recognizing his United States citizenship and all relief that flows therefrom.

The government contends that although Madar Sr. was a United States citizen when he was born in Czechoslovakia in 1940, he lost his citizenship prior to petitioner Madar's birth by failing to meet the statutory requirements for retention of that citizenship. Thus, Madar Sr. did not have the ability to transmit citizenship to petitioner Madar when he was born in Czechoslovakia in 1964. And even if this court were to recognize that the doctrine of constructive physical presence applies to the derivative claim that Madar Sr. retained his citizenship, the appellate courts consistently have held that the doctrine is inapplicable to the requirements for transmission of citizenship. Thus, the government requests that the petition be denied because petitioner Madar cannot meet the statutory requirements to establish a claim of citizenship and the facts do not support the extraordinary relief requested.

The record establishes that petitioner's paternal grandmother, Julianne Cikovsky, was a United States citizen by birth. She was born in 1906 in Youngstown, Ohio. In 1919, she emigrated to the former Czechoslovakia. She married petitioner's grandfather in 1927 in Czechoslovakia. Madar Sr. was produced from that union and was born in 1940 in Smizany, Czechoslovakia. Madar Sr. never resided in the United States.

Madar Sr. married Margita Kozakova in March of 1963 in Czechoslovakia. Margita Kozakova was not a United States citizen. Madar Sr. and Margita Kozakova Madar had two

children.    Petitioner Madar was born in 1964 in Spisska, Nova Ves, Czechoslovakia.    Eva Madarova, petitioner's sister, also was born in Czechoslovakia in 1966.

Madar Sr. was aware from the time he was a young boy that his mother had been born in the United States.    He was unaware throughout much of his life that he had any right or potential claim to United States citizenship as a result of his mother's citizenship.    Madar Sr. traveled to the United States in 1991, 1992 and 1993, on a temporary travel visa to visit petitioner Madar.    He attempted to return on January 25, 1996, July 25, 1996, June 4, 1997 and July 2, 1998, but was denied a visitor's visa on those occasions.    He only became aware of his ability to make a claim of United States citizenship after being informed of the same by petitioner Madar in 1999.    Madar Sr. died in June of 2005 and was unable to return to the United States after his 1993 visit.

Petitioner Madar informed his father of his (Madar Sr.'s) claim to United States citizenship in conjunction with petitioner Madar's immigration case.    At that time Madar Sr. executed an affidavit attesting to the circumstances that existed in Czechoslovakia under the communist rule that followed World War II.    During this time the phenomenon commonly referred to as living behind the Iron Curtain greatly inhibited if not outright precluded his ability to comply with any retention requirement, i.e., that he reside in the United States for a period of time in order to retain his United States citizenship.

At the time of Madar Sr.'s birth Czechoslovakia was occupied by German troops of the Nazi regime.    At the end of the war, Czechoslovakia fell under a communist government dominated by the Soviet Union.    Until the fall of the Soviet Union, citizens of Czechoslovakia were not free to move about within the country or to take steps to emigrate to another country, such as the United States.    Any effort by Madar Sr. toward such an undertaking would have placed him and his family at risk for reprisals such as being denied a job, demoted or fired, having his children being denied educational opportunities or placed in inferior schools, and

being evicted from the family home or forced to live in inferior housing.    Such actions also would have placed Madar Sr.'s parents at risk for similar reprisals.

Even if Madar Sr. would have inquired about the potential to emigrate to the United States, it virtually was impossible for Czechoslovakian citizens to receive permission to emigrate to the United States.    The process was very long, taking years to complete.    There was no assurance that one would be granted the ability to leave.    When permission was received, the applicant would suffer the aforementioned reprisals and be forced to repay the government for the cost of the applicant's education.    This state of affairs made it impossible for Madar Sr. to emigrate to the United States and fulfill the residency requirement to retain his citizenship and thereby transmit United States citizenship to petitioner Madar.

The issue of whether Madar Sr. could advance the defenses of unawareness and/or impossibility and assert a claim of constructive physical presence in order to maintain a claim of citizenship on his own behalf is an inquiry separate and distinct from whether petitioner Madar can prevail in his claim that his father transmitted citizenship to him at birth.    These inquiries are governed by different statutory provisions and jurisprudential considerations.    And a close look at each dictates that the inquiries produce different results.

As an initial matter, the court agrees with petitioner in his assertion that Madar Sr. could have employed the defenses of unawareness and/or impossibility and the doctrine of constructive physical presence to establish a claim of citizenship had he done so prior to his death.

At the time of Madar Sr.'s birth in 1940, the applicable law was section 1 of the Citizenship Act of 1934:

> 'Sec. 1993. Any child hereafter born out of the limits and jurisdiction of the United States, whose father or mother or both at the time of the birth of such a child is a citizen of the United States, is declared to be a citizen of the United States; but the rights of citizenship shall not descend unless the citizen father or citizen mother, as the case may be, has resided in the United States previous to the birth of such child. In cases where one of the parents is an alien, the right of

citizenship shall not descend unless the child comes to the United States and resides therein for at least five years continuously immediately previous to his eighteenth birthday, and unless, within six months after the child's twenty-first birthday, he or she shall take an oath of allegiance to the United States of America as prescribed by the Bureau of Naturalization.'"

H.R. Rep. No. 3673, 73d (2d Sess., 1934).

Madar Sr.'s mother was born in the United States in 1906 and had resided here until 1919 when she emigrated to Czechoslovakia. Her husband (Madar Sr.'s father) was a non-citizen. Madar Sr. was born in Czechoslovakia. Under section 1 of the Citizenship Act of 1934 Juliana Cikovsky Madar transmitted United States citizenship to Madar Sr. at his birth.

In order for Madar Sr. to retain his United States citizenship, Madar Sr. was required to come to the United States and reside here for at least five years immediately prior to his eighteenth birthday ("the retention requirements"). In other words, to retain his citizenship Madar Sr. was required to come to the United States by the age of thirteen and remain here until his eighteenth birthday. He also would have been required to take an oath of allegiance to the United States within six months of his twenty-first birthday.

In 1952, Congress passed the Immigration and Nationality Act, which removed the retention requirements for acquisition of citizenship for those born after December 24, 1952. At the same time, Congress amended the retention requirements for all born abroad after May 24, 1934, to provide:

Any person who is a national and citizen of the United States at birth under paragraph (7) of subsection (a), shall lose his nationality and citizenship unless he shall come to the United States prior to attaining the age of twenty-three years and shall immediately following any such coming be continuously physically present in the United States for at least five years: provided, that such physical presence follows the attainment of the age of fourteen years and precedes the age of twenty-eight years.

Subsection (b) shall apply to a person born abroad subsequent to May 24, 1934: provided, however, that nothing contained in this subsection shall be construed to alter or affect the citizenship of any person born abroad subsequent to May 24, 1934, who, prior to the

effective date of the Act, has taken up a residence in the United States before attaining the age of sixteen years, and thereafter, whether before or after the effective date of this Act, complies or shall comply with the residence requirement for retention of citizenship specified in subsection (g) and (h) of section 201 of the Nationality Act of 1940, as amended.

In order for a child born abroad to a United States citizen and an alien to retain citizenship under these provisions the child was required to come to the United States prior to the age of twenty-three and be physically present for five years between the ages of fourteen and twenty-eight.    66 Stat. 163, section 301(a)(7) 1952 - previously codified at 8 U.S.C. § 1401(a)(7).

Madar Sr. never emigrated to the United States or resided here for any period of time. Thus, he failed to meet the retention requirements and lost his citizenship in 1954 under the Citizenship Act of 1934 and/or in 1963 under the Immigration and Nationality Act of 1952 under a straightforward application of the statutes.

It has long been recognized that compliance with the retention requirements is subject to equitable considerations where an individual born abroad is seeking merely to maintain or regain United States citizenship acquired at birth.    Such considerations are exemplified in Matter of Farely, 11 I. & N. Dec. 51 (1965).    There, the applicant for citizenship had been born in Canada.    The applicant's father had been born in the United States in 1909 and then taken to Canada by his parents in 1915.    The father then remained in Canada and married a Canadian citizen in 1932.    The applicant was a legitimate issue of that marriage and was born and raised in Canada.

The applicant's father was a United States citizen at the time of the applicant's birth, but thereafter voted in Canada and expatriated himself.[2]    The mother remained a Canadian citizen at all times.

The applicant became aware of his possible claim to citizenship when he applied for an

---

[2] The applicant likewise voted in Canada in 1954.    This activity was not an expatriating act due to the applicant's lack of knowledge of his potential claim to United States citizenship at the time.

immigrant visa at the American Consulate in February of 1963.   He was issued limited

documentation and entered the United State in May of 1964 to pursue his claim of United States

citizenship.   At that time the applicant was twenty-seven years of age and had not previously

been in the United States.   Id. at 52.   The applicant thereafter returned to Canada on several

occasions, each for one or more days after the applicant had reached twenty-eight years of age.

Id. at 53.

The Board of Immigration Appeals upheld the applicant's claim of citizenship based on

several principles.   First, it noted that "the retention requirement of section 301(b), Immigration

and Nationality Act, requiring continuous physical presence in the United States for at least five

years between the ages of fourteen and twenty-eight, [has been held to] not operate to deprive an

individual of United States citizenship until he has had a reasonable opportunity to come to the

United States as a United States citizen after learning of such claim to citizenship."   Id. at 52-53

(citing Matter of Yanez-Carrillo, 10 I. & N. Dec. 366 (1963)).   Based on this principle, the

applicant's entry in 1963 was deemed to be timely.   Id. at 53.

Second, the principle of "constructive residence and physical presence" was employed to

deem the retention requirements to be satisfied.   The Board opined:

Constructive residence and physical presence in the United States are concepts
regularly given effect in the field of immigration and nationality law.   Thus, in the Matter of
L--B--D--, (4 I. & N. Dec. 639 (1952)), in considering the question of whether United States
citizenship was retained under a statute which required the child to take up residence in the
United States before sixteen years of age, the Attorney General ruled that the retention
requirements were satisfied although factually residence was not taken up until after that age
because of conditions beyond the control of the child.

Id. at 53.   It cited two other cases employing constructive residence or physical presence and

further opined:

The conclusions in these cases were based on the fact that failure to comply was due to
circumstances beyond the control of the persons involved.   In such cases it is equitable not to
penalize individuals for circumstances beyond their control.   Such a situation would also

exist when the failure to come to the United States is due to ignorance of a claim to citizenship.    In the instant case, it is concluded that the concept of constructive physical presence is also applicable in accordance with the principle of law that no conduct results in expatriation unless it is engaged in voluntarily (<u>Nishikawa v. Dulles</u>, 356 U.S. 129 (1958)).

<u>Id.</u>

The Board then extended the constructive presence doctrine to the requirement that one be physical presence subsequent to his or her arrival in the United States.    <u>Id.</u> at 54.    Drawing on the very definition of "constructive" and viewing the equitable circumstances giving rise to the applicant's inability to satisfy the retention requirements after arrival, the Board extended the doctrine and concluded that the applicant was deemed to have been present from his twenty-third through his twenty-eighth birthday, concluding that "applicant's constructive physical presence, coupled with his actual physical presence, amounted to a full compliance with the retention requirements of section 301(b)."    Id. at 54.

Were the matter before this court limited to the retention requirements alone, we would have no problem concluding that Madar Sr.'s lack of knowledge of his potential claim to United States citizenship until 1999 coupled with his inability to emigrate while subject to the Iron Curtain (which existed until well after petitioner Madar's birth in 1964) supply a sound basis for application of the constructive physical presence doctrine.    Both defenses of unawareness and impossibility of performance have well-established foundations in retention of citizenship claims.    <u>See</u> 7 Foreign Affairs Manual 1100 Acquisition and Retention of U.S. Citizenship and Nationality, Appendix K – Defenses of Unawareness, Impossibility of Performance, Constructive Compliance, and Official Misconduct (7 FAM 1110 App. K).    Under this and the preceding authorities, equity supports the claim that Madar Sr. retained his right of citizenship during his ignorance of his potential claim to United States citizenship and his inability to emigrate while under the communist government controlling Czechoslovakia prior to the fall of the Soviet Union.    In other words, Madar Sr. retained his citizenship at least through the time of petitioner Madar's birth.

The issue for consideration, then, is whether Madar Sr.'s ability to satisfy the requirements for retention of citizenship through constructive physical presence can be used to satisfy the physical presence requirements for transmission of citizenship to petitioner Madar. Save one exception, the courts uniformly have rejected the extension of constructive physical presence to the transmission of citizenship. And we are compelled to believe it is this uniform approach that supplies the law governing petitioner Madar's citizenship claim. Thus, as a matter of law petitioner Madar's citizenship claim must be deemed to be without merit.

"The applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that was in effect at the time of the child's birth." Runnett v. Schultz, 901 F.2d 782, 783-84 (9th Cir. 1990) (citing Rodriguez–Romero v. INS, 434 F.2d 1022, 1023 (9th Cir. 1970) (per curiam), cert. denied, 401 U.S. 976 (1971)). At the time petitioner Madar was born in 1964, the applicable law governing citizenship was section 301(a)(7) of the 1952 Immigration and Nationality Act, 8 U.S.C. § 1401(a)(7), which provided:

> (a) The following shall be nationals and citizens of the United States at birth:
> …
> (7) a person born outside the geographical limits of the United States and its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years.

8 U.S.C. § 1401(a)(7) (1952). Thus, petitioner Madar must show that Madar Sr. was "physically present in the United States . . . for a period . . . totaling not less than ten years, at least five of which were after attaining the age of fourteen years."

The record indisputably demonstrates that petitioner Madar must rely on the doctrine of constructive physical presence to make this showing and that Madar Sr. could have claimed such presence based on unawareness and circumstances beyond his control. However, the courts

have held that the application of the doctrine in a transmission of citizenship setting based on either ignorance or circumstances beyond the control of the individual would be an unauthorized exception to the legislative framework that "cannot be accommodated in the absence of evidence of a contrary legislative intent."   Tullius v. Albright, 240 F.3d 1317, 1321 (11th Cir. 2001).

The seminal case to consider whether constructive physical presence can be extended to the transmission setting based on a parent's ignorance of the physical presence requirement was Runnett.   There, the petitioner's mother was born in Canada but was a United States citizen by virtue of her father's United States citizenship.   She had resided with her parents in the United States as a young child from 1916 through 1918 and thereafter lived in Canada.   She married a Canadian citizen and gave birth to the petitioner in Canada.   She was ignorant of the residency requirements to transmit citizenship until after the petitioner's birth.   Id. at 783-84.

The Runnett court rejected the contention that constructive residence could be extended to the transmission of citizenship setting based on a showing of ignorance of the requirements. Id. at 784.   It advanced three reasons for its holding.   First, it highlighted the substantive distinction between claims where Congress was in effect stripping an individual of acquired citizenship without his or her consent and those involving transmission of citizenship and reasoned as follows:

> The application of constructive residence to citizenship retention cases, however, does not necessarily support its application to citizenship transmission cases.   As indicated in Rogers v. Bellei, 401 U.S. 815, 821–22 [] (1971), courts have traditionally hesitated to find that Congress could take away citizenship without the citizen's consent. This concern has led to the application of constructive residence in order to preserve an individual's retention of citizenship.   Similar concern, however, could not exist for the transmission of citizenship where citizenship is simply not being conferred.

Id.

Second, the prior precedent had rejected the notion that the residency requirements for transmission of citizenship could be satisfied by subjective intent. Id. In Rodriguez–Romero v. INS, 434 F.2d 1022, 1023 (9th Cir. 1970) (per curiam), cert. denied, 401 U.S. 976 (1971), the court had held that Congress used the phrase "residence in the United States" for the purpose of transmitting citizenship "as plainly as possible to denote an objective fact." Id. at 1024. "To identify the 'required place of residence' it required only that it be the place of general abode." Id. (quoting Savorgnan v. United States, 338 U.S. 491 (1950)). In doing so it excluded the subjective intent of the person under consideration. Id.

Third, the court observed that the doctrine of constructive residence was inconsistent with the general purpose of the 1940 Nationality Act. Runnett, 901 F.2d at 785. In passing the Act, Congress sought to limit the perpetuation of United States citizenship to those who had a real American background or connection to the United States that went beyond a mere desire to acquire United States citizenship. Id. The court reasoned that the statutory residence requirement reflected a desire by Congress to promote actual compliance and avoid a non-expansive approach and concluded that "the statutory requirements were directly aimed at cases like the Runnetts'." Id.

The Second Circuit reached the same conclusion in Drozd v. Immigration and Naturalization Service with regard to the defense of impossibility. There, the petitioner sought to establish the constructive physical presence of his father based on his father's inability to emigrate from Poland back to the United States as a result of financial constraints, World War II, and imprisonment after the war. 155 F.3d 81, 86 (2d Cir. 1998).

Petitioner Drozd's father, Edward Drozd, was born in the United States in 1917.

Edward Drozd was taken by his family to Poland in 1920. Edward tried to return to the United States in the late 1930s, but was unable to do so due to financial constraints and the Nazi invasion of Poland. During the war Edward joined a Polish partisan unit that fought the Nazis. He was arrested by the Nazis for being active in the resistance and imprisoned. He remained in Poland until at least 1944. In October of 1944 he was arrested by the Soviets and imprisoned until after the war. Id. at 84.

In January of 1945, Edward Drozd appeared at the American Consulate in Berlin and requested assistance in returning to the United States. He was sent to Poland to acquire supporting documentation. He presented the requested documentation at the United States embassy in Warsaw, Poland, in March of 1946, and registered for the United States Selective Service. His application for a United States passport was approved, but he was unable to leave because he was arrested and imprisoned in Poland on charges of collaboration with the Nazis. He was released in 1949 and again attempted to leave, but was refused an exit permit by Polish authorities, who considered him to be only a Polish citizen. Id.

Edward Drozd was married in 1951 in Poland and had children there, including petitioner Drozd who was born in 1953. Edward Drozd was issued a passport and exit permit in 1958. He traveled back to the United States in 1959 with his wife and children. Id. at 83-84. Petitioner Drozd did not seek to become a naturalized citizen after his arrival. Id. at 83.

Petitioner Drozd became subject to deportation proceedings in 1994 after committing a number of criminal offenses. Petitioner Drozd advanced a claim of United States citizenship based on the contention that Edward Drozd had transmitted citizenship to

petitioner Drozd upon his birth.   Among other bases, petitioner Drozd contended that Edward Drozd satisfied the physical presence requirements for transmission of citizenship under the 1952 Immigration and Nationality Act because he was prevented from returning to the United States from 1940 to 1952 due to forces beyond his control.   Id. at 83-85.   Among other grounds, petitioner Drozd claimed his father "was constructively present from 1940 to 1952, the period he wanted to depart Poland for the United States, but was unable to do so because of financial constraints, war and imprisonment."   Id. at 86.

The United States Court of Appeals for the Second Circuit held that the doctrine of constructive physical presence was inconsistent with the plain language employed by Congress in setting the requirements for transmission of citizenship to a foreign-born child and an exception of that nature could not be "accommodated 'in the absence of evidence of a contrary legislative intent.'"   Id. at 86 (quoting United States v. Smith, 499 U.S. 160, 167 (1991) and citing B.F. Goodrich v. Betkoski, 99 F.3d 505, 517 (2d Cir. 1996) ("The canon of construction that says '*expressio unius est exclusio alterius*' cautions against creating additional exceptions to complex statutory enactments."), cert. denied, 524 U.S. 926 (1998))).

The Second Circuit advanced three principal reasons for rejecting the constructive physical presence doctrine in the transmission of citizenship setting.   First, it observed nothing in the 1952 Immigration and Nationality Act supported a contrary conclusion.   Id. at 87.   To the contrary, in passing the 1952 Act Congress sought to tighten the legislative scheme and advance strict adherence to the plain terms of the statute.   Id.   It did so by replacing the more-lenient phrase of "residence" with the more demanding phrase of "physical presence."   Id.   And a logical inference from doing so was that Congress sought to curtail

the expansive approach that the courts had given to the residency requirement in the Nationality Act of 1940. Id. (citing INS v. Phinpathya, 464 U.S. 183, 198 (1984) (Brennan, J., concurring) ("physical-presence" substituted for "more lenient 'residence' requirement" in other sections of the 1952 Act in order to eliminate troublesome problems created by judicial interpretations of residence as allowing extended periods of absence); Matter of V-, 9 I. & N. Dec. 558, 560, 1962 WL 12854 (1962) ("There is no indication in the committee reports that the language change was for purposes other than the elimination of troublesome problems involving 'constructive' residence which had theretofore been encountered, and to make it clear that 'residence' meant 'physical presence' and nothing else.")).

Second, the Drozd court noted that the appellate authority consistently had rejected that contention that constructive physical presence could be used to satisfy the requirements for transmission of citizenship. It referenced the reasoning of the Ninth Circuit in Runnett and Rodriguez-Romero in likewise holding that "the application of constructive residence was inappropriate in a citizenship transmission case." Id.

Finally, the Second Circuit found the cases advanced by petitioner Drozd to be unpersuasive and distinguishable. It rejected the cases that considered only a petitioner's ability to establish the retention of citizenship through the defense of impossibility as inapplicable to the transmission of citizenship. Id. at 88 ("Unlike the instant matter, Puig Jimenez [v. Glover, 255 F.2d 54 (1st Cir. 1958)] did not concern the transmission of citizenship by a citizen parent to a child born abroad."). It distinguished Navarrete as a situation involving wrongful conduct by a United States official that precluded the petitioner therein from entering the United States. In contrast, Edward Drozd had not been prevented

from entering the United States due to official government conduct.    To the contrary, once Edward Drozd had obtained the requested documentation and presented it in Warsaw, government officials issued him a passport and he was permitted to emigrate to the United States.    Id.

The Second Circuit also considered other grounds advanced by petitioner Drozd. These included a contention that Edward Drozd had secretly worked for the United States during the war, that his citizenship remained intact under the Savings Clause of the 1952 Act, the government had engaged in conduct placing Edward Drozd in a zone of danger and giving rise to equitable estoppel and Edward Drozd's unawareness that he had failed to comply with the requirements to transmit citizenship to petitioner Drozd.    Id. at 88-91.    The court rejected each of these as well and upheld the determination that Edward Drozd did not transmit citizenship to his foreign-born son.    Id. at 91.

The United States Court of Appeals for the Eleventh Circuit likewise rejected the contention that constructive physical presence can be used to satisfy the retention requirements for transmission of citizenship in Tullius.    There, the petitioner, Ray Tullius, was born in Canada and contended he acquired citizenship at birth from his father, Nick Tullius.    Among other things, petitioner Tullius asserted the district court had erroneously held that the doctrine of constructive physical presence did "not apply to the physical presence requirement for transmission of United State citizenship under 8 U.S.C. § 1401(A)(7) (1973)." 240 F.3d at 1318.

Petitioner Tullius's grandmother was born in 1915 in Cincinnati, Ohio.    She was taken by her parents to Romania in 1920.    She was married and gave birth to Nick Tullius in

Romania in 1935. Nick acquired United States citizenship at birth as a result of his mother's citizenship. In 1945, Nick's mother was deported to a soviet forced-labor camp, where she died that same year. Id. at 1319.

Due to travel restrictions by the Romanian government, Nick was unable to leave Romania until 1961, when he renounced his Romanian citizenship and emigrated to Canada. He became a naturalized citizen of Canada in 1966 and petitioner Tullius was born in Canada in 1973. Id.

In 1997, Nick learned for the first time that he had a potential claim for United States citizenship. He applied for a United States passport and received one after he executed "an oath pursuant to Section 324(d)(1) of the Immigration and Nationality Act, 8 U.S.C. § 1435(d)(1)." Id. The oath indicated it was "for use under Section 324(d)(1) of the Immigration and Nationality Act by a person who was a citizen of the United States at birth and lost such citizenship for failure to meet the physical presence retention requirements under Section 301(b) [of the] INA." Id. As part of acquiring citizenship in this manner Nick further indicated under oath that he understood "that taking the oath restores U.S. citizenship as of the date of the oath and is not retroactive to the date of failure to retain." Id.

Petitioner Tullius, a tax attorney in Florida, applied for a United States passport in 1998. His application was denied and he filed an action seeking declaratory relief in the United States District Court for the Southern District of Florida. The Secretary of State filed for summary judgment, contending Nick's citizenship had lapsed for lack of physical presence during the period of time required under § 1401(b) of the 1952 Immigration and Nationality Act. Petitioner Tullius cross-filed for summary judgment on the basis Nick satisfied "both

the citizenship retention requirement and the citizenship transmission requirement under the constructive physical presence doctrine." Id. The district court granted the Secretary's motion and denied petitioner Tullius' cross motion.

Petitioner Tullius contended on appeal that the doctrine of constructive physical presence should "apply to transmission cases when the citizen is prevented from satisfying the physical presence requirement due to circumstances beyond his control." Id. at 1320. The court rejected that position and followed the reasoning in Drozd. Id.

Consistent with Drozd, the Eleventh Circuit concluded "that the plain meaning of 8 U.S.C. § 1401(a)(7) prevents this interpretation." Id. (citing Drozd, 155 F.3d at 86–87 and Runnett, 901 F.2d at 784). It observed that Congress had crafted two specific exceptions to the retention requirements in relation to transmission of citizenship, one involving service in the Armed Forces of the United States and one involving periods of employment with the United States. Id. at 1320-21. These two legislative exceptions (which in effect recognized the constructive physical presence doctrine) persuasively counseled against judicially creating a third for circumstances beyond the control. And the fact that Congress sought to tighten the requirements by replacing the earlier "residence" requirement with a "physical presence" requirement in the 1952 Act further counseled in favor of "strict adherence to the plain terms of the Act." Id. at 1321 (quoting Drozd, 155 F.3d at 87).

The above body of appellate case law forecloses petitioner Madar's contention that he acquired United States citizenship at birth from his father. It is undisputed that Madar Sr. failed to satisfy the retention requirements for transmission of citizenship through actual physical presence prior to petitioner Madar's birth in 1964. And like the situations in Drozd

and <u>Tullius</u>, the impossibility of performance created by the communist rule in Czechoslovakia after the war falls short of a reason to deviate from the mandate of Congress under the Citizenship Act of 1934, the Nationality Act of 1940, or the Immigration and Nationality Act of 1952. And as implicitly recognized in <u>Runnett</u> and <u>Tullius</u>, it follows *a fortiori* that the inability to meet the requirements due to unawareness must be rejected for the same reasons.

Petitioner Madar's efforts to thread the needle by referencing the ongoing validity of <u>Navarrete</u> and seeking to analogize his situation to one within its purview is unavailing. In <u>Navarrete</u>, the petitioner's mother began to satisfy the retention requirements through physical presence in the United States. She made frequent trips back and forth between Mexico and the United States, which included at least six entries into the United States in 1953 and 1954. In September of 1954, she was denied entry by a government official based on the official's erroneous interpretation of the law. She made several attempts to have her status reconsidered, but each time she was directed to travel to the Consulate's office in Juarez, Mexico and was unable to make the trip.

Navarrete's mother next tried to enter the United Sates as a citizen in 1963. Following a hearing, she was declared to be a United States citizen because, as she testified, had she not been wrongfully denied entry into the United States she would "have completed the period of physical presence necessary to insure retention of her United States citizenship." <u>Id.</u> at 142. She had given birth to two children, "a boy and a girl born in Ojinaga, Chihuahua, Mexico, on August 11, 1960 and January 31, 1962, respectively."

The children filed applications to be citizens and a special inquiry officer found that

they were, ordered they be admitted and forwarded the matter to the Board of Immigration

Appeals.   Id. at 138.   The issue before the Board was "whether the constructive presence of

the applicants' mother in the United States, for the necessary period of more than one year,

can be counted as the continuous year of physical presence in the United States before the

children's birth, which is required before citizenship can pass to them at birth under the

provisions of section 309(c)."   Id. at 141.

      The Board held that the doctrine of constructive physical presence could and did

apply.   It opined:

> Constructive residence and physical presence are concepts which are not
> strangers to the field of immigration and nationality law.   They normally come into
> play in situations where actual residence or physical presence were prevented by
> circumstances beyond the individual's control, or by reliance upon erroneous
> information received from a United States official.   In such cases it is not equitable to
> penalize individuals for factors they could not control or circumstances they did not
> create. (Cf. Matter of Farley, supra.)
>
> Here, the applicants' mother was prevented, in September 1954, from coming to
> the United States to reside permanently, by a United States official acting under an
> interpretation of the law later conceded by the Government to be erroneous.   Had she
> then been admitted, she could (and claims she would) have completed the period of
> physical presence necessary to insure retention of her United States citizenship.   The
> same period of physical presence would have qualified her to pass on citizenship at
> birth to these applicants.
>
> With regard to citizenship retention, the special inquiry officer has held not that
> the circumstances waived the necessity for physical presence, but rather that they justify
> a finding that the applicants' mother was constructively physically present in the United
> States for the required period.   We hold, with him, that where constructive physical
> presence has already been found for a specified period for one purpose, its existence
> during that same period should not be overlooked or ignored for a related purpose.   We
> find that the applicants' mother has had sufficient physical presence in the United States
> to comply with section 309(c) of the Immigration and Nationality Act.   The special
> inquiry officer's order will be affirmed.

Id. at 142.   Thus, the children were recognized to be United States citizens based on their

mother's statutory compliance with the provisions for retention of citizenship pursuant to the doctrine of constructive physical presence.

Petitioner Madar notes that each of the appellate cases discussed above left Navarrete intact and he highlights Navarrete's recognition that once constructive physical presence is found for a particular purpose, its application should not be overlooked or ignored for a related purpose. He further seizes on its acknowledgement that the doctrine is recognized in scenarios where the failure to comply is due to "circumstances beyond the individual's control" and analogizes his situation as falling within the exception recognized in Navarrete.

Petitioner Madar does not fall within the equitable circumstances recognized in Navarrete. Every appellate court to consider the matter has held that the equitable relief recognized in Navarrete is a form of estoppel premised on governmental misconduct. See Runnett, 901 F.2d at 784 n. 3 (Navarrete does not stand for the broad recognition that constructive residence can apply in a transmission of citizenship case; to the contrary, "the BIA concluded only that Navarrete had relied upon a U.S. official's erroneous interpretation of law and thus she had constructively completed the necessary residency requirements to retain her U.S. citizenship, and that her constructive residency period could apply to the requirement necessary to transmit citizenship to her foreign-born children."); Drozd, 155 F.3d at 88 (distinguishing Navarrete on the basis that the petitioner's father had not been wrongfully prevented from entering the United States to satisfy the physical presence requirements); Tullius, 240 F.3d at 1321 ("Finally, in the instant case as in Drozd, there is no allegation here that appellant's father was wrongfully or erroneously prevented by United States officials from entering the United States, as was the case in Matter of Navarrete . . . .").

The secondary authorities characterize <u>Navarrete</u> in the same manner.    <u>See</u>, <u>e.g.</u>, 3

IMMIGRATION LAW SERVICE 2d § 14:47 ("The United States may be estopped from enforcing

the retention requirements against a citizen if it supplies the citizen with erroneous

information regarding his or her status, which misinformation results in his or her failure to

comply with the applicable retention requirements."); 7 Foreign Affairs Manual 1100

Acquisition and Retention of U.S. Citizenship and Nationality, Appendix K – Defenses of

Unawareness, Impossibility of Performance, Constructive Compliance, and Official

Misconduct (7 FAM 1110 App. K) (same).

    Madar Sr. was not prevented from complying with the retention requirements for

citizenship as a result of a government official's misconduct.    Thus, <u>Navarrete</u> does not

provide petitioner Madar with an avenue for relief.    In addition, Madar Sr. did not

successfully restore his citizenship in a prior proceeding through the doctrine of constructive

physical presence or otherwise.    Consequently, <u>Navarrete</u> is distinguishable.

    It follows that petitioner Madar has failed to present a viable basis for claiming

violation of the equal protection embodied in the Due Process Clause.    At is core, equal

protection is a mandate that all persons similarly situated be treated alike.    <u>Shuman ex rel.</u>

<u>Shertzer v. Penn Manor School Dist.</u>, 422 F.3d 141, 151 (3d Cir. 2005) (quoting U.S. Const.

amend. XIV, § 1 and citing <u>City of Cleburne v. Cleburne Living Ctr.</u>, 473 U.S. 432, 439

(1985)).    At a minimum, establishing an equal protection violation requires a claimant to

"demonstrate that they received different treatment from that received by other individuals

similarly situated."    <u>Id.</u> (quoting <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469, 1478 (3d

Cir. 1990) and citing <u>Kuhar v. Greensburg–Salem Sch. Dist.</u>, 616 F.2d 676, 677 n. 1 (3d Cir.

1980)).

Here, petitioner Madar is not similarly situated to the petitioner in <u>Navarrete</u>.  He is similarly situated to the petitioners in <u>Runnett</u>, <u>Drozd</u> and <u>Tullius</u>.  The principles established in those cases preclude his claim of citizenship.  Consequently, his petition pursuant to § 2241 claim for declaratory relief recognizing his United States citizenship must be denied. Appropriate orders will follow.

<u>Date: February 2, 2018</u>

<u>s/David Stewart Cercone</u><br>
David Stewart Cercone<br>
Senior United States District Judge

cc: Mark A. Goldstein, Esquire
  Jill Locnikar, AUSA
  Sairah G. Saeed, AUSA

  (*Via CM/ECF Electronic Mail*)

  The Honorable Paul D. Kovac